GEORGE GILL ROBERTS

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed February 21, 1907—Rehearing denied April 11, 1907.*

1. MURDER—*when proof of conspiracy is not competent.* Upon the trial of the clerk of a political club election for the murder of a candidate who he claimed had made an assault upon him, it is not error to exclude evidence that the candidate and his supporters had ·entered into a conspiracy to oust the regularly appointed judges and clerks and carry on a fraudulent election, where everything that was in fact said or done was admitted, and the defense interposed was purely one of self-defense and related solely to what took place between the deceased and the defendant.

2. SAME—*how election was conducted after affray immaterial.* Proof of the manner in which a club election was conducted after the affray in which the defendant fatally wounded one of the candidates is not competent, where the only question in the case is whether the defendant was assaulted by the deceased and was acting in self-defense when he inflicted the fatal wound.

3. SAME—*what evidence is admissible on the trial of an election clerk for murder.* Upon the trial of a clerk of a political club election for the murder of a candidate who was trying to get possession

of the ballot-box to investigate a charge of ballot-box stuffing, it is not error to admit in evidence the bunch of ballots which were taken from the box after only two men had voted, as tending to show the reason for the investigation and in corroboration of the witnesses for the prosecution, even though it is not claimed the defendant was in any conspiracy to stuff the ballot-box.

4. SAME—*what does not justify election clerk in killing candidate.* A candidate for president of a political club has a right to use reasonable means to ascertain whether a fraud has been committed by a voter by stuffing the ballot-box, and a clerk of the election who has charge of one of the rosters is not justified in killing such candidate, even to defend his possession of the roster, during an attempt by such candidate and his supporters to reach the ballot-box and investigate the alleged fraud.

5. EVIDENCE—*fact that men in line were not known to election clerk is not material.* The fact that the men in line waiting to vote for a certain candidate for the office of president of a political club were nearly all strangers to an election clerk cannot be proved upon the trial of such clerk for murder of the candidate, as tending to show that they were not entitled to vote, where the club has a membership of over four thousand persons.

6. SAME—*when admission of photograph of the deceased is not ground for reversal.* Admitting in evidence, in a murder trial, a photograph of the deceased, whose identity as the person killed was admitted by the defendant, is not, of itself, ground for reversal, even though the evidence is unnecessary and might properly have been excluded.

7. APPEALS AND ERRORS—*one who fails to object to improper remarks at request of court waives his rights.* A party who makes no objection to alleged improper statements of opposing counsel in his argument because requested by the court not to do so waives his right to urge such remarks as error on appeal, since if there is no objection and exception to a ruling or refusal to rule there is nothing preserved for review in that respect.

8. INSTRUCTIONS—*practice of giving irrelevant instructions not approved.* The practice of giving instructions in a criminal trial wholly irrelevant to any issue in the case is not commended, and will be ground for reversal of a judgment of conviction unless it is entirely clear that the instructions did not operate to the prejudice of the defendant.

9. SAME—*instruction not based upon evidence may be refused.* An instruction in a murder trial stating the right of a person to resist by force an attempt to commit a felony, even to taking the life of the person making the attempt, is properly refused, where there is no evidence of any attempt to commit a felony.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

KICKHAM SCANLAN, LEROY RICHARDS, and JOHN F. TYRRELL, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (ROBERT N. HOLT, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Plaintiff in error was indicted by the grand jury of Cook county for the murder of John V. Kopf. His plea was not guilty and he was tried in the criminal court of Cook county. The jury found him guilty and fixed his punishment at imprisonment in the penitentiary for a term of twenty years. Motions for a new trial and in arrest of judgment were denied and he was sentenced on the verdict.

These facts were proved: On November 28, 1905, the annual election of the officers of the Thirteenth Ward Republican Club of Chicago was to be held at three o'clock P. M. at 1460 West Madison street, in said city. The opposing candidates for president were William J. Jackman, who was then president, and John V. Kopf, the deceased. By the constitution and by-laws the managing committee, consisting of the officers and one member from each primary district, was authorized to appoint judges and clerks of the election. At a meeting of the committee, of which each member was notified and at which all were present except five who were supposed to be supporters of Kopf, the committee appointed Frank Farnum, Samuel Leitzell and George D. Jensen as judges and John J. Callahan and the defendant as clerks. The election was to be held in a store room fronting north on Madison street. From the front door a railing was put up, running diagonally toward the east wall and then along the east side of the room at a sufficient distance to

form a passageway for voters, who were to enter the room at the front door, go along this passageway past a platform near the south end, where the ballot-box was, and pass out through an opening in the east wall. The platform was somewhere from eighteen to twenty-two inches high and the framework was seven feet three inches by ten feet three inches, and was floored over, with the exception of the east thirteen inches. On the platform were two tables, one a little over three feet long by something over two feet wide, which was placed lengthwise near the railing, for the ballot-box and judges, and the other a round table on the platform at the north-west corner, for the use of the clerks. About twelve o'clock the judges and clerks took their places on the platform, with the ballot-box and rosters of the different precincts in the ward. They remained on the platform and had luncheon and beer at noon. About half-past one o'clock a line of supporters of Kopf entered the building, and some time before the hour for the election this line extended a considerable distance in the street, but whether those in the street were Kopf supporters does not appear. About ten minutes before three o'clock, when the election was to commence, Kopf came into the room in the space before the platform, and at his request the ballot-box was opened, inspected and measured and found all right. There were fifteen men who had followed Kopf into the room and taken positions in the passageway along the railing. Kopf was a county commissioner, and the leaders of his faction acting in his interests were largely persons holding minor county positions. There was one bailiff, one record writer from the criminal court, two clerks from the board of election commissioners, one from the probate court, two employees of the county treasurer, one from the county hospital, one clerk from the board of review, one elevator man from the county building, and there were also two minor officials from the drainage canal board. Kopf took a position in the center of the room and made a speech to the men in the line, stating that he had been promised, at a meeting

at Jackman's house, a judge and clerk of the election, and he had not been allowed them, and claiming his right to have a judge and clerk. He read from a paper the names of fifteen persons and said that he wished these persons to serve him,— one as judge, one as clerk and thirteen as challengers. His claim was, that Jackman told him that he had the power to give him a judge and clerk and he would do so, but as to whether any such statement was made by Jackman the evidence was conflicting. It was understood between Kopf and the persons whose names he read, that when their names were called they would come over the railing to the place where he was. When Kopf read the name of John P. Lanahan, the man from the office of the clerk of the criminal court, he came over the railing and Farnum insisted that he should go back, and he went back at Kopf's direction. The time for opening the election arrived before Kopf concluded his speech, and a man named Coffman, at the head of the line, who was bailiff in the sheriff's office, handed up his ticket. Farnum took it, but Kopf told Coffman not to vote yet, and his ticket was handed back by Farnum, who then called on the next man to vote. The next man declined to do so, and Farnum then said if they would not vote the judges and clerks would. Farnum then deposited his ballot and the clerks checked him off the list. Jensen then attempted to vote, and according to the testimony of a number of witnesses he had a lot of ballots folded together in a bunch so thick that they would not go through the slot into the box, and when the ballots were taken out of the ballot-box after the election there was a bunch of ballots for Jackman answering the description. The cry went up along the line that they were stuffing the ballot-box, and immediately the supporters of Kopf came over the railing into the space in front of the judges and clerks. It is impossible to state with entire accuracy the sequence of events from this time, from the fact that practically everything occurred at the same time and the trouble was all over in a few moments. There was

a railing in front of the platform and there was some evidence that it was torn down, but the preponderance of the evidence is that it was not. A man named Waugh, a clerk in the office of the election commissioners, who was identified by the various witnesses as "the red-haired man," rushed upon the platform, followed by Lanahan. There was a police sergeant named Landers present with several policemen, and Landers and some of the policemen also got on the platform. Waugh engaged in a struggle with the judges for the possession of the ballot-box, and Lanahan engaged in it and seized Farnum. Farnum demanded that he be allowed possession of the ballot-box as one of the legally appointed judges of the election, whereupon Landers, the sergeant, struck at Farnum with his club, but his aim was bad and he struck the chandelier overhead. There was evidence that Landers also called Jensen a vile epithet, and said, "I will run this election," and that when Leitzell told him he was a judge of the election and needed protection, he said: "Screw your nut out of here; I will take charge of this election." Leitzell left. Farnum got away from Lanahan, and, with either Lanahan or Landers hanging to his coat-tails, got over the railing and ran away as fast as he could. At the same time that the others went upon the platform Kopf started to go upon it at the north-west corner, where the table of the clerks was. Callahan, one of the clerks, was sitting on a chair which was tipped back, with the roster before him ready to check off names, and as Kopf came by him Kopf either brushed against him or pushed or shoved him and knocked off his hat. Callahan picked up his hat and put it on his head and took an immediate departure. The defendant was also sitting down at the clerks' table, and the disputed questions of fact in the case relate to what then occurred. He had an open knife lying on the table in front of him, and the testimony for the prosecution was, that when Kopf was on his way to the ballot-box at the other table to expose the alleged fraud of Jensen and ascertain the facts, the defendant rose

up and stepped toward him with the knife, inflicting the wound which caused his death, and that Kopf made no assault upon the defendant. Defendant's testimony was, that when he went to check off the name of Coffman he found his pencil point broken and took out his knife and sharpened the pencil and then laid the knife down; that when the disturbance occurred he looked over toward the ballot-box and saw Landers raise his club to strike Farnum, and then his attention was attracted across his table to Kopf pushing Callahan; that as he started to get up Kopf pushed him, and as he was knocked back his hand fell on the table and on the knife; that he grabbed up the knife and began waving it in front of him and called out: "Stand back, gentlemen! Stand back!" and "Stand back! Let me out of here!" that it seemed to him there were a dozen men all striking at him at once, of whom he knew Kopf and Simpson, a clerk in the office of the election commissioners; that Kopf made a lunge at him and suddenly fell back, and the defendant was horrified and did not intend to kill anybody. Simpson was following Kopf on the platform, and the evidence for defendant was, that Kopf attacked defendant, causing a swelling and discoloration on the side of his jaw. Witnesses for the prosecution testified that there was nothing like a bruise, swelling or discoloration on the jaw. Kopf received a slashing cut from defendant with the knife across the left side of the abdomen, about five inches long, which caused his death, and the cut was made through his clothing and his suspender was severed. Jensen and defendant were taken away by the police, and the other judges and clerks having run away, the remaining crowd selected judges and clerks and conducted an election.

It is first contended that the verdict of the jury was not warranted by the facts proved. The judges and clerks were regularly chosen in conformity with the constitution and by-laws of the organization, and the plan of Kopf and his followers was to compel the substitution of a judge and clerk

representing Kopf's interest. That was doubtless the reason
for his direction to his supporter, Coffman, not to vote yet.
He made a speech to his adherents demanding his rights as
he claimed them, and it had been arranged to have the per-
sons chosen by him come over the railing when he called
their names. The evidence would justify the conclusion
that they intended to accomplish their purpose by force.
Kopf had asked Farnum who Jensen was and if he did not
vote at the last democratic primary, which Farnum admitted
but said that he was then a republican and belonged to the
club. Conceding the intention of Kopf and his supporters
to have been as stated, defendant would not have been justi-
fied in killing Kopf because of such plan or intention, which
was not put in execution. His defense, and only defense,
was, that Kopf made a personal assault upon him which jus-
tified the killing. While Kopf was making his speech and
before there was any move to substitute a judge and clerk,
his followers began to shout about stuffing the ballot-box,
and Kopf then tried to get to the box. He was interested
as a candidate and had a right to use reasonable means to
ascertain whether a fraud was being committed by Jensen
and the ballot-box being stuffed. The defendant did not
have charge of the ballot-box and had no responsibility about
it and no interest in it, and he so understood, for he paid no
attention to the trouble over it, except as a spectator. He
did have possession of one set of the rosters of the different
precincts, and claimed that when Kopf came past Callahan
he knocked Callahan's rosters off the table. Afterward the
table was upset and the rosters scattered about. But even if
defendant had been defending his possession of the rosters
as one of the regular clerks, it would not have justified the
killing of Kopf. It is clear, however, that Kopf was not
after the rosters, and that his only effort was to reach the
ballot-box.

The only defense available was, that Kopf assaulted de-
fendant in such a manner as would justify a reasonable per-

son in believing that he was in danger of losing his life or receiving great bodily harm. The jury concluded that there was no assault of that character upon the defendant, and the verdict is justified by the evidence. It may be that in the excitement of the moment it appeared to the defendant that the air was full of desperadoes, all of whom were striking at him, but it is clear that such was not the fact and that it would not have so appeared to a reasonable person. The jury had good ground for believing that the defendant was not assaulted at all and that there was no bruise or discoloration on his jaw.

The next complaint is, that the trial court erred in its rulings on the admission and rejection of evidence, and several objections are made to such rulings. It is contended that the court erred in excluding evidence that Kopf and his supporters had entered into a conspiracy to displace the legally appointed judges and clerks, to take possession of the ballot-box and rosters and to carry on a fraudulent election. The court permitted proof of everything that was said or done by Kopf or any of his party, and there was no reason to suppose from anything that was said or done that Kopf or his supporters intended to oust the legally appointed judges. The intention evidently was to insist upon having one judge and one clerk, but it is perfectly clear that there was no intention to oust the others or to take possession of the ballot-box or rosters. The speech that Kopf made indicated the position and purpose of both Kopf and his supporters. Objections were sustained to various questions as to the intention of parties whose names were called, to jump over the railing and take positions as a judge, clerk and challengers, but the fact that there was an understanding of that kind was proved and not denied. The defense was purely and simply self-defense, and while the defendant was justified in acting upon the appearances presented to him, the question what was going on in the minds of other parties, not disclosed by any act or word, was immaterial.

The next proposition under this head is, that the court erred in refusing to allow defendant to prove the manner of conducting the election after the affray was over. The evidence took far too wide a range on both sides, doubtless owing to the natural desire of each faction to prove that such faction was in the right. After the affair was over the Kopf faction elected judges and clerks and held an election, but the fairness or want of fairness of such election has nothing to do with this case or the guilt or innocence of defendant.

It is contended that the court erred in allowing the prosecution to offer in evidence the bunch of ballots alleged to have been cast by Jensen for Jackman. The grounds of the objection seem to be, that defendant was not present when the ballots were taken from the box but had been arrested and taken away, and that he was not a party to the alleged stuffing of the ballot-box. There was no evidence tending to prove that the defendant was in any conspiracy to stuff the ballot-box, but we think the evidence was admissible as tending to show a reason for the attempted investigation of the matter and in corroboration of witnesses for the prosecution. Some witnesses testified that Jensen forced a bunch of ballots through the slot, and Coffman claimed to have seen, through a glass in the side of the box, ballots dropping into it, while Jensen denied that he cast more than one ballot.

It is further complained that the court improperly refused to permit the defendant to show by witnesses that the men in the line were nearly all unknown to them and were not residents of the ward or members of the club. The only material fact was, that the men in the line were there as adherents and supporters of Kopf, and that fact was proved. Evidence offered to the effect that they were unknown to witnesses would not have been sufficient to show that they were not entitled to vote, as there were over four thousand members of the club.

It is complained that the court allowed a woman to testify as to a conversation with the man who kept a cigar stand

226—20

in the front end of the building. The cigar man had already testified, without objection, to the same conversation, and while it was irrelevant it was not hurtful to the defendant. There was a sick woman in the adjoining building and the cigar man warned her attendant of the probability of drunkenness, fighting and other offensive conduct usual at these elections, which might tend to alarm the sick woman.

The court did not err in excluding evidence as to how the defendant came to be selected as a clerk and who nominated him, which was only offered to show that his conduct was proper in accepting the position of clerk and which did not tend to establish either guilt or innocence.

The court admitted in evidence a photograph of the deceased, although the defense admitted that Kopf was the person killed. The evidence was unnecessary and might properly have been excluded, but the only use of it which is complained of, consists of statements of the assistant State's attorney in his closing argument. No objection was made to anything that the State's attorney said, and there was no ruling as to its propriety. Counsel say that they did not make any objection because the court requested them not to do so. As they waived their legal rights at the request of the court there is nothing for us to pass upon. The admission of the photograph is not, in itself, ground for reversal. Objections must be made to the court, and exceptions can only be taken to rulings of the court or refusal to rule. In this case there is nothing in the remarks of the assistant State's attorney that would justify a reversal if there had been rulings and exceptions.

Complaint is made that the court refused to allow defendant to show the interest and prejudice of some of the witnesses. The attempt was to show that they were political henchmen of Kopf, as county commissioner, and as to one of them, that he was retained in his position by Kopf's brother. It clearly appeared that the witnesses were holding county positions and that they were active and ardent sup-

porters of Kopf and engaged in the affair as such, and nothing would be gained by further investigation of their interest or prejudice.

It is insisted that the trial court erred in instructing the jury. It must be confessed that the court gave to the jury an unwarranted number of instructions. There were forty-four given at the request of the prosecution and thirty-two given at the request of the defendant. The most fertile brain could not conjure up seventy-six legal propositions involved in this case or which it was necessary for the jury to understand for its decision. The court gave numerous instructions wholly irrelevant to any issue in the case, and practically the whole domain of the criminal law relating to homicide was exhibited to the jury. There was an instruction as to the sufficiency of mere words to justify the killing of a person; two instructions as to circumstantial evidence tending to prove the commission of the crime charged by the individual charged with it; instructions as to the killing of a person by one who is in the commission of an unlawful act which, in its consequences, naturally tends to destroy human life; one as to the killing of a person in combat by an original aggressor who has in good faith declined further struggle before the mortal blow was given; and a general assortment abstract in form and suitable for any sort of case that might arise. The practice of giving instructions not applicable to the case has been repeatedly condemned. (*Dunn* v. *People*, 109 Ill. 635; *Hayner* v. *People*, 213 id. 142; 11 Ency. of Pl. & Pr. 150; 12 Cyc. 651.) If we did not feel clear that the instructions in this case did not prejudice the defendant we should reverse the judgment. No court would originate the idea that numerous propositions contained in the instructions related to this case or that there was any necessity for enlightening the jury concerning them. The jury were fully and fairly instructed on the part of the defendant, and every principle of law applicable to the case was given to the jury as requested by his counsel.

No error was committed in the refusal of any instruction offered in his behalf. One was refused to the effect that the defendant had a right to kill Kopf for the purpose of retaining possession of the ballot-box and rosters; and another, the substance of which was that if there was a conspiracy to assail the platform and take possession of the ballot-box and rosters by force, and the defendant endeavored to protect the ballot-box and rosters, and in so doing cut the deceased, the jury should find the defendant not guilty, if they found that he acted in an honest and reasonable manner. The defendant was not defending the ballot-box, as he admitted in his testimony, and Kopf was not attempting to take the rosters away from him, according to his own account. The instructions were properly refused for that reason if they had been otherwise correct. Another refused instruction stated the same proposition as to assailing the platform, and authorized the jury to take such facts into consideration in determining whether or not the deceased or the defendant was the original aggressor, even though the defendant did not know of the conspiracy. There was no reason for the invasion of the platform, or attempt to do so, until the instant when it was charged that Jensen was stuffing the ballot-box. An instruction which was refused stated the law as to resisting by force an attempt to commit a known felony, and, if need be, killing the person making the attempt. There was no evidence of any attempt to commit a felony, and the instruction was not applicable to the case. There were two instructions on the presumption of innocence of the defendant which were refused, but the rule on that subject was stated in various instructions which were given.

The defendant was entitled to a fair and impartial trial in conformity to law, and so far as we can see he received such a trial. We find no error for which the judgment ought to be reversed.

The judgment is affirmed.        *Judgment affirmed.*